## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CRIMINAL CASE NO. |
| | 3:16-cr-00010-TCB-RGV |
| | |
| BRANDEN OTOUPAL | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION,
## AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Branden Otoupal ("Otoupal") is charged in a two-count indictment with knowingly using, persuading, inducing, enticing, and coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing that the visual depiction would be transmitted using a means and facility of interstate commerce, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), and with knowingly possessing at least one computer storage device containing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). [Doc. 1].[1]  Otoupal has moved to suppress statements he made to federal agents during an interview at his residence upon the execution of a search warrant and to suppress evidence obtained from a search of his cell phone, [Docs. 11 & 13], and

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

following an evidentiary hearing on August 5, 2016,[2] the parties filed post-hearing briefs, [Docs. 21, 23, & 24].  For the reasons that follow, it is **RECOMMENDED** that Otoupal's motions to suppress statements and evidence, [Docs. 11 & 13], be **DENIED**.

## I.  STATEMENT OF FACTS

Homeland Security Investigations ("HSI") Special Agent Denice Crump ("Agent Crump"), who was assigned to the child exploitation and human trafficking unit, initiated an investigation after receiving information that an individual associated with a specific Internet Protocol address, later identified as being assigned to a residence located at 1553 Horsley Mill Road in Carrollton, Georgia, was believed to have accessed child pornography on a Russian website.  (Tr. at 4-7).  Based on this investigation and surveillance of the Carrollton residence, which was a single family home located in a secluded, wooded area, Agent Crump applied for and obtained a federal search warrant for the residence, authorizing the seizure of computers, computer storage media, cell phones, and other items that may be used to store child pornography.  (Tr. at 7).

---

[2] See [Doc. 18] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted an exhibit, which will be referred to as "(Gov. Ex. 1)."

A team of about eight to ten HSI agents, including Agent Crump, executed the search warrant on August 19, 2015, at approximately 7:00 a.m. (Tr. at 8, 31).[3] The HSI agents, who were armed and dressed in tactical vests with either HSI or police markings, approached the residence, and Agent Crump, along with Special Agent Michael Ashley ("Agent Ashley"), knocked on the front door two or three times while announcing, "Police with a warrant." (Tr. at 9-10, 24-25, 28, 41-42). After there was no response, the agents moved to a side door of the house under the carport and knocked while again announcing their presence. (Tr. at 10). At this time, the agents had their weapons drawn. (Tr. at 16-17). After "a few knocks," Otoupal's father, James Otoupal, answered the door and appeared to have just woken up, and he informed the agents that his wife, Tami Otoupal, and his son, Otoupal, were inside the home. (Tr. at 10, 37, 60-61). James Otoupal called for his wife and son to come out, and after his wife came out, the agents went around the house to the basement door where they encountered Otoupal and his friend, Dallas LeBlanc ("LeBlanc"). (Tr. at 11, 43-45, 48-49, 61-62).

After the agents gathered all four individuals outside of the home, they conducted a protective sweep of the residence for weapons and other individuals,

---

[3] In addition, eight to nine officers from the Carroll County Sheriff's Office were also present, but remained outside to secure the perimeter as HSI agents approached the residence. (Tr. at 8-9, 27-28).

which lasted approximately seven to nine minutes.  (Tr. at 12-13).  During the

protective sweep, Agent Crump remained outside with all four occupants, all of

whom were placed in handcuffs for officer safety reasons.  (Tr. at 12-13, 30, 49, 62-

63).  Once Agent Crump received the signal that the residence was clear, the agents

holstered their weapons and removed the occupants' handcuffs and explained to

them that they were being detained while the agents executed a federal search

warrant.  (Tr. at 13-14, 17, 32, 63).[4]

During the execution of the warrant, HSI agents proceeded to interview the

occupants of the residence.  (Tr. at 14).  Agents Crump and Ashley first interviewed

James Otoupal, who was initially suspected to be the target of the investigation, for

about 20 to 25 minutes outside under the carport, while the remaining occupants

were taken back inside the residence.[5]  (Tr. at 14-15).  Agents Crump and Ashley

---

[4] Although Agent Crump testified that the occupants were only in handcuffs for about seven to nine minutes, (Tr. at 13), LeBlanc testified that the handcuffs were removed after about twenty to thirty minutes, (Tr. at 49), and Otoupal's mother testified that they were in handcuffs for about fifteen to twenty minutes, (Tr. at 63). However, it is undisputed that the handcuffs were removed from all occupants following the protective sweep of the residence.  See generally [Doc. 18].

[5] LeBlanc and Otoupal's mother both testified that they were brought back into the house and instructed to "sit on the couch and not to move until it was [their] turn to be talked to[.]" (Tr. at 50, 64).  Otoupal's mother also testified that she was asked where their cell phones were located and she told them where they could find them and provided a password for her phone because she did not feel it was an option to refuse to provide law enforcement the password upon request. (Tr. at 64-65, 71).  She also said that she was not allowed to move freely around the home and

then interviewed Otoupal in the same location as his father's interview, beginning at approximately 8:00 a.m. (Tr. at 15).[6]  At the outset, Agent Ashley asked Otoupal if he would speak with them, to which he responded "yes," and the agents then advised him that he was not under arrest, that he was free to leave, and that he could stop talking to them at any point during the interview.  (Tr. at 18, 36).[7]  The agents obtained Otoupal's biographical information and then asked him various questions, and Otoupal proceeded to make certain incriminating statements. See (Gov. Ex. 1).

About five and a half minutes into the questioning, Agent Crump asked Otoupal if he had a cell phone and what the password was, and Otoupal provided

---

that when she expressed the need to go to the bathroom, a female agent escorted her and waited until she was finished to escort her back to the couch.  (Tr. at 64-65).

[6] There were no cars parked in the carport and the interview took place at a work table that was set up within the carport area, with Otoupal and Agent Ashley seated during the interview while Agent Crump remained standing.  (Tr. at 15-16) Behind Otoupal was "grass, plenty of yard space, maybe the baby's toys that were out there and then the tree line," but "there was no enclosure of the carport."  (Tr. at 16).  At this time, Otoupal's mother and LeBlanc were also being interviewed by other agents outside of the home.  (Tr. at 14, 32).

[7] Although the interview was audio recorded, see (Tr. at 18, 20-21; Gov. Ex. 1), the recording did not begin until after Otoupal agreed to speak with the agents and was advised that he was not under arrest at approximately 8:02 a.m., (Tr. at 18-20, 33-34; Gov. Ex. 1 at 00:17-00:20).  In contrast, both LaBlanc and Otoupal's mother testified that they were not advised that they were free to leave or that they did not have to speak with law enforcement prior to their interviews.  (Tr. at 50, 64).

the password, but stated that his phone was not in the house and was with his brother in Alabama.  (Tr. at 36, 38, 40; Gov. Ex. 1 at 5:27-6:04, 6:39-7:15).[8]  Following this line of questioning, Otoupal advised the agents that he was "not all there" and that he had taken Valium, which he stated had been prescribed for his anxiety and panic disorder, and that he was also "very sleepy," but when asked by the agents if he wanted to stop the interview or whether he could speak with them, he replied, "I can talk to you," but that he just wanted to be asleep.[9]  (Tr. at 19-20, 34; Gov. Ex. 1 at 6:01-6:26); see also (Gov. Ex. 1 at 55:06-55:17).  Otoupal was specifically advised of the basis of the investigation, see (Gov. Ex. 1 at 29:10-30:50), and Otoupal appeared to understand the questions being asked of him and responded appropriately, (Tr. at 20-21; Gov. Ex. 1).  During the course of the interview, Agent Ashley advised Otoupal that he was not under arrest at least three times, (Gov. Ex. 1 at 30:55-30:58, 32:27-32:32), and at about forty-three minutes into the interview, Otoupal commented that he was "fine on his blood sugar," that he was just "not used to being up so early," and he then asked for an agent to retrieve his cigarettes, (id. at 43:08-43:42, 49:01-49:04).  Toward the end of the interview, Otoupal explained

_____

[8] During the execution of the search warrant, agents actually located what was believed to be Otoupal's cell phone inside the house.  (Tr. at 40).

[9] During the interview, Otoupal also advised the agents that he drank a lot of alcohol and smoked "weed" in the past and that he suffered from diabetes.  (Tr. at 34-35, 37; Gov. Ex. 1).

that he did things when he was really drunk, including viewing certain pornographic websites, and that he hoped the agents never had to see him "really drunk" because he had "gotten past that." (Id. at 54:12-54:28). The interview concluded after approximately one hour at 9:00 a.m. (Tr. at 20-21; Gov. Ex. 1).[10]

---

[10] While the agents' weapons were visible, they remained holstered during the entirety of the interview, and at no time during the interview did the agents make any promises or threaten Otoupal in any way. (Tr. at 17-18). Otoupal was not handcuffed or restrained in any way during the interview, and the agents offered him water and retrieved his cigarettes for him to smoke after he requested them near the conclusion of the interview. (Tr. at 19, 35; Gov. Ex. 1 at 43:20-43:42, 55:24-55:31). At no time did Otoupal indicate that he wanted to stop the interview or refuse to answer any questions. (Tr. at 23-24). LeBlanc testified at the evidentiary hearing that at the time the agents woke them up, she and Otoupal had only been asleep for two hours and that Otoupal had consumed about four "Four Locos," which she estimated had about fourteen percent alcohol content, and was "very intoxicated." (Tr. at 45-46, 56, 58). LeBlanc testified that she had been around Otoupal on other occasions when he was intoxicated and that he does not usually stumble around, but normally would just "repeat himself a lot." (Tr. at 46-47). She also stated that when they were on their way back to Otoupal's house earlier that morning, his blood sugar dropped "into the low 30s" and he "was very weak and kind of dazed, out of it, and he was also intoxicated as well on top of it." (Tr. at 48, 54-55). She said they stopped to get him something to eat and that when they arrived at his house, she had to help him down the stairs and he fell asleep "almost immediately." (Tr. at 48, 56). Otoupal's mother testified that she noticed when they were waiting outside to be interviewed by the agents that Otoupal looked pale and clammy and that he often woke up with low blood sugar and so she mentioned to an agent that Otoupal was "on an insulin pump and he had not had the ability to check his sugar since he was awakened." (Tr. at 66). She also described that when Otoupal's blood sugar was low, he did not think clearly and would not make wise decisions and that he also drank "entirely too much alcohol" daily and was a "functioning alcoholic." (Tr. at 68-70). She stated that after the agents left, Otoupal checked his blood sugar and it was around 52. (Tr. at 69). However, at no point during the interview did Otoupal indicate that he was suffering from any type of medical distress or suggest that he could not continue with the interview. (Tr. at 43); see generally (Gov. Ex. 1).

After concluding the interview, the agents "packed up [their] belongings," but Otoupal asked if he could speak with Agent Ashley, and he then led the agents to a child's room located inside the house. (Tr. at 21-22, 39). Once inside the room, Otoupal apologized to the agents "for not being honest . . . about his cell phone" and then informed them that they would find explicit communications with a minor on his phone. (Tr. at 22, 35-36, 38, 40).[11] This entire conversation, which was not recorded because Otoupal initiated it after the agents had already packed up the recorder, lasted about five to seven minutes, and the agents then left the residence after approximately two hours and forty-five minutes had passed without placing Otoupal under arrest.[12] (Tr. at 23, 39-41). Otoupal was indicted on May 11, 2016, [Doc. 1], and he was subsequently arrested pursuant to an arrest warrant on June 1, 2016, [Doc. 3]; see also [Doc. 11 at 1]. Otoupal moves to suppress the statements he made on August 19, 2015, [Doc. 11], as well as the evidence obtained from the search of his cell phone, [Doc. 13].

---

[11] The minor Otoupal described is the subject "of one of the counts, the production of child pornography[.]" (Tr. at 22).

[12] Otoupal's mother testified that the agents were at their residence from 7:00 a.m. until 11:00 a.m. or 12:00 p.m. (Tr. at 70, 73).

## II.  DISCUSSION

**A.**     **Motion to Suppress Statements, [Doc. 11]**

Otoupal moves to suppress the statements he made during the interview at his residence upon the execution of the federal search warrant on the grounds that the statements were obtained in violation of Miranda[13] and were not made voluntarily.  [Doc. 23 at 10-17].  The government responds that Otoupal's statements are admissible because Miranda warnings were not required and the statements were voluntary.  [Doc. 21 at 6-12]; see also [Doc. 24].

**1.**     *Miranda Violation Claim*

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.  See Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  "Statements

---

[13] See Miranda v. Arizona, 384 U.S. 436 (1966).

9

made in violation of *Miranda* are not admissible at trial." United States v. Barry, 479

F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

Agents Crump and Ashley's questioning of Otoupal on August 19, 2015, clearly constituted interrogation, but the parties dispute whether Otoupal was in custody for Miranda purposes at the time of the interview. A defendant is in custody under Miranda when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[14] United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). However, "[a]n interviewee's

---

[14] Otoupal argues that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave, and he relies on the testimony of his mother and LeBlanc to show that a reasonable person would not have felt free to leave, see [Doc. 23 at 11-12, 14], but the "Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)). In other words, "'a free-to-leave inquiry reveals *only* whether the person in question was seized.' While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*.'" United States v. Luca-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citations omitted). Thus, "the standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (citations and internal marks omitted); see also United States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (citations omitted) ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); see also United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting Minnesota v. Murphy, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'"). Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." Barry, 479 F. App'x at 299 (quoting Brown, 441 F.3d at 1347). This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Brown, 441 F.3d at 1347 (citation and internal marks omitted). Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" Matcovich, 522 F. App'x at 851 (quoting Howes v. Fields,

132 S. Ct. 1181, 1189 (2012)). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (internal marks omitted) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Barry, 479 F. App'x at 299 (quoting Street, 472 F.3d at 1309). Another relevant factor is the location of the questioning. In particular, "[a]lthough not dispositive, 'courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" Matcovich, 522 F. App'x at 851 (quoting Brown, 441 F.3d at 1348)). Courts should also consider whether a suspect was "unambiguously advis[ed] . . . that he is free to leave and is not in custody." Id. (alterations in original) (citation and internal marks omitted). "This is a 'powerful factor' that 'generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Id. (citation omitted). Other factors include "the duration of the questioning, statements made during the interview, the presence of physical

restraints during questioning, and 'the release of the interviewee at the end of the questioning[.]'"  Id. (quoting Howes, 132 S. Ct. at 1189).

Applying these factors to the instant case, the Court finds that Otoupal was not in custody for purposes of Miranda during the interview of August 19, 2015. After the agents assembled the occupants of the house in a central location and explained to them that they were executing a search warrant, the agents interviewed the occupants separately from each other.  (Tr. at 13-15).  Before interviewing Otoupal in the carport area of the home, Agent Ashley asked Otoupal if he would speak with the agents and advised him that he was not under arrest, but was free to leave or to stop speaking with them at any time.  See (Tr. at 15, 18, 36).[15]

---

[15] Otoupal argues that "there is no credible evidence that [he] knew that he was not under arrest" because Agent Crump chose not to record the "introduction to the interview." [Doc. 23 at 13].  He further argues that "[n]either LeBlanc or Tami Otoupal stated that they were given these warnings prior to being interviewed," and "Tami Otoupal stated they were told that they would be questioned, implying that no option was given." [Id.].  However, Agent Crump credibly testified that she and Agent Ashley advised Otoupal that he was not under arrest and free to leave or to cease talking with them before beginning the interview, (Tr. at 18, 36), which is consistent with the audio recording of the interview which reflects that the agents reminded Otoupal at least three more times during the interview that he was not under arrest, (Gov. Ex. 1 at 30:55-30:58, 32:27-32:32).  Moreover, the fact that Tami Otoupal and LeBlanc, who were interviewed by different agents, see (Tr. at 14), may not have been advised that they were free to leave and that they did not have to speak with law enforcement, or that Tami Otoupal felt that it was not an option to refuse to provide the password to her cell phone upon request, see (Tr. at 50, 64-65, 71), in no way discredits Agent Crump's testimony and the audio recording that reflects Otoupal was given these warnings prior to and during the interview and that he voluntarily provided the password to his cell phone upon request, see (Gov.

Otoupal's handcuffs had already been removed prior to the interview, and he was not restrained in any way during the interview. (Tr. at 19). The agents spoke in a calm tone of voice, no promises or threats were made, and the interview was brief, lasting only one hour. (Tr. at 17-21, 35; Gov. Ex. 1); see also United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (finding suspect not in custody when questioned for four hours); Muegge, 225 F.3d at 1269, 1271 (finding suspect not in custody where interview lasted about two and a half hours). Although the agents initially had their weapons drawn and may have physically touched Otoupal to bring him out of the house, Agents Crump and Ashley's weapons were holstered throughout the interview and there is no evidence that Otoupal was physically touched in any way at the time of questioning or thereafter. (Tr. at 17-18; Gov. Ex. 1); see also United States v. Blocker, CRIMINAL ACTION NO. 1:14-cr-228-AT/AJB, 2016 WL 3281018, at *17 (N.D. Ga. Feb. 29, 2016) (citations omitted), adopted by 2016 WL 3259096, at *2 (N.D. Ga. June 14, 2016). Moreover, the agents expressly advised Otoupal during the course of the interview that he was not under arrest. (Gov. Ex. 1 at 30:55-30:58, 32:27-32:32). At the conclusion of the interview, after the agents had packed up their belongings, Otoupal requested to speak with Agent Ashley, and he then led the agents to a room inside the home where a conversation lasting about

_____

Ex. 1).

five to seven minutes took place.  (Tr. at 21-23, 35-36, 39-41).  From the time the agents entered the residence until their departure, neither Otoupal, nor any of the other occupants, were placed under arrest or taken into custody, and Otoupal was not ultimately arrested until after he was indicted about ten months later.  (Tr. at 23, 39-41); [Doc. 3; Doc. 11 at 1].

Otoupal essentially argues that even though the interview took place in a familiar setting, the residence was nonetheless a police-dominated atmosphere at the time and he was not free "to move around as he wished," [Doc. 23 at 13-14],[16] but the fact remains that Otoupal "was interviewed in familiar surroundings," United States v. Rogers, Criminal Action No. 1:09–CR–544–TWT–ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010), adopted *sub nom* by United States v. Rodgers, Criminal File

---

[16] Otoupal asserts that LeBlanc and his mother's testimony "demonstrate[s] that a reasonable person in his position would not have felt free to move around" during the execution of the search warrant and that this restriction on his movement around the house is tantamount to a custodial situation.  [Doc. 23 at 12].  However, as previously noted, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," and the "limitations on [Otoupal's] freedom of movement were tempered by the fact that they would only last for the time it took to search the residence and thus had an expected endpoint, unlike the more open-ended prospect of a formal arrest[.]"  United States v. Peck, 17 F. Supp. 3d 1345, 1359, 1363 (N.D. Ga. 2014), adopted at 1348.  Furthermore, "the Eleventh Circuit has found that the requirement that a subject sit while the house was being searched does not amount to custody."  Id. at 1363 (citation omitted).  Simply put, "[b]eing required to sit with family members in the living room of one's home . . . does not amount to the type of coercion associated with a formal arrest," and here, "the restrictions placed upon [Otoupal] and his family members were less than those found to amount to custody in other cases."  Id. at 1363-64 (collecting cases).

No. 1:09–CR–544–TWT, 2010 WL 2697084, at *1 (N.D. Ga. Jul. 7, 2010) (interview during execution of search warrant held not custodial where defendant was questioned in his driveway and was prohibited from re-entering his home until the search was complete), which strongly militates against a finding that the interrogation was custodial, see Matcovich, 522 F. App'x at 851 (citation omitted). Furthermore, the credible evidence shows that Otoupal was advised prior to the interview and during the interview that he was not under arrest and did not have to answer questions, (Tr. at 18, 36; Gov. Ex. 1 at 30:55-30:58, 32:27-32:32), and "[t]his advice has been held to be a 'powerful factor' that 'generally will lead to the conclusion that the defendant [wa]s not in custody,'" Blocker, 2016 WL 3281018, at *17 (last alteration in original) (citation omitted). The Court is simply not persuaded that the circumstances of Otoupal's interview–where Otoupal was seated comfortably at a work table within the carport area in the familiar surroundings of his own home, free from physical restraints, and where the agents spoke to him in a calm tone of voice with their weapons holstered and allowed him to drink water and smoke a cigarette–"present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." Peck, 17 F. Supp. 3d at 1359 (citation omitted). Nor does the mere fact that Otoupal was temporarily detained during the execution of a routine search warrant suffice to convert the interview into

a full-blown custodial interrogation. Moreover, "[t]here certainly was no restraint on [Otoupal's] freedom of movement of a degree associated with formal arrest," Rogers, 2010 WL 2721883, at *2, which is required to establish custody under Miranda, see Brown, 441 F.3d at 1347 (citations omitted).

In sum, because Otoupal was not subject to custodial interrogation when the agents spoke with him at his home on August 19, 2015, Miranda warnings were not required. The statements were not obtained in violation of Miranda, and they are not due to be suppressed on that basis. See Matcovich, 522 F. App'x at 852 (finding interview during execution of search warrant in defendant's residence was non-custodial where entry by law enforcement created a "'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but where, "'shortly thereafter, the search warrant was announced, the handcuffs were removed,'" and the defendant was told that he was not under arrest).

### 2.   *Voluntariness*

Otoupal also moves to suppress his statements on the ground that the statements were involuntary. [Doc. 23 at 15-17]. Specifically, Otoupal contends that at the time he was interrogated, he was "impaired" in that his "blood sugar was low," that he had been "drinking the night before and had only been asleep a couple

of hours when the agents arrived," and that he suffered from a "panic and anxiety disorder which [could] make it difficult for him to leave the house" and for which "he was prescribed Valium," all of which "call into question whether any of [his] statements to the agents were truly voluntary." [Id. at 17].  The government argues that Otoupal's statements were voluntary and that the "copy of the recorded interview . . . provides conclusive evidence that [he] was not suffering from a drop in blood sugar that prevented him from exercising rational choice" and that he was "lucid[.]"  [Doc. 24 at 3].

Although Otoupal's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Otoupal] were voluntary in order to admit them at trial."  United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11-cr-00058-ODE-RGV-1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of the circumstances test directs the Court ultimately to

determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Id. (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345 (citation omitted).  Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making

of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Otoupal concedes that he was not threatened or made any promises in exchange for his agreement to speak with the agents. See [Doc. 23 at 17].  Rather, Otoupal maintains that he suffers from various physical and mental conditions and that he advised the agents that he was a diabetic and that he had taken Valium and was "very sleepy," and that these conditions rendered his statements involuntary. [Id.].  However, after advising the agents about his various conditions, Otoupal confirmed that he could speak with the agents at that time, (Tr. at 19-20, 34; Gov. Ex. 1), and the audio recording of the interview indicates that he understood the questions being asked of him and responded appropriately in a lucid and coherent manner, and that when specifically asked about his blood sugar, he responded that he was "fine on his blood sugar," but that he was just "not used to being up so

early," and he requested his cigarettes, (Tr. at 20-21; Gov. Ex. 1 at 43:08-43:42, 49:01-49:04).

In addition, the audio recording reveals that Otoupal acknowledged he was sober during questioning when he made the comment that he hoped the agents never had to see him "really drunk" since he had "gotten past that," and that he did not appear to be impaired by stumbling over his words, slurring his speech, or repeating himself as LeBlanc testified that he would do when intoxicated. (Tr. at 46-47; Gov. Ex. 1 at 54:12-54:28). There is simply "no evidence in the record indicating that on the day the agents questioned [Otoupal], [he] was affected by any [physical or mental] disorders," and he "did not appear to be suffering from any [physical or] mental disorder, nor did his answers suggest that he was." United States v. Tolbert, Criminal Action File No. 1:14-cr-102-TCB, 2015 WL 3505147, at *11 (N.D. Ga. June 1, 2015), adopted at *1. Nothing in the record calls into question Otoupal's ability to have understood his situation and the agents' questions, as the recording of the interview and Agent Crump's testimony establish that he was lucid and provided coherent answers during the interview, despite reporting that he had taken a Valium and was sleepy. Lazarus, 552 F. App'x at 896; see also United States v. Martin, 781 F.2d 671, 674 (9th Cir. 1985) (internal marks omitted) ("[A]lthough the defendant was injured and under medical care at the time the statements were made, the type,

dosage, and schedule of painkilling narcotic administered to [defendant] was not sufficient to overbear his will to resist the questioning or impair his rational faculties."). Indeed, the recorded interview demonstrates that "although [Otoupal] made a few complaints about how he was feeling, he remained coherent and capable of understanding what was being said to him, and he provided relevant responses, even disagreeing at times with the interviewing officers on some points." United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *14 (N.D. Ga. Aug. 6, 2015) (citation omitted), adopted at *5.[17]

On these facts, the government has shown that, under the totality of the circumstances, Otoupal's statements on August 19, 2015, were voluntary. See

_____

[17] Although Otoupal again relies on LeBlanc and his mother's testimony that he was basically a functioning alcoholic; that earlier that morning while on the way back to the house, Otoupal's blood sugar had dropped and he was weak and dazed and had to stop to eat; and that after the agents arrived and had assembled all of the occupants outside of the home, Otoupal's mother observed that Otoupal looked pale and clammy and often woke up with low blood sugar, (Tr. at 46-48, 54-55, 66), their testimony does not overcome Otoupal's own statements to the agents reflected in the audio recording of the interview showing that Otoupal was coherent, lucid, cooperative, and alert; understood the questions being asked of him and was able to respond appropriately during the interview; appeared to be aware of his surroundings and to comprehend the consequences of speaking with the agents; and specifically stated that he was fine with his blood sugar, but was just sleepy and had taken Valium, see (Gov. Ex. 1); see also Lazarus, 552 F. App'x at 895-96 (finding defendant's confession, which was "made during a brief, non-custodial interview during which she was not subject to any threats and was not physically detained," was voluntary despite her diabetic condition causing her to feel tired and faint and to be experiencing low blood sugar).

22

United States v. Sturdivant, 796 F.3d 690, 696 (7th Cir. 2015) (finding the district court did not err in determining that defendant's statements were not rendered involuntary on account of his diabetes); see also United States v. Smith, 322 F. App'x 876, 878 (11th Cir. 2009) (per curiam) (unpublished) (finding that although defendant had been intoxicated at least three hours prior to the interview, he made a voluntary waiver of his rights during questioning and even acknowledged that he was sober during questioning); Garrett v. Beard, No. 14CV1572 BEN (PCL), 2015 WL 1727936, at *19-20 (S.D. Cal. Apr. 15, 2015), adopted at *4 (finding defendant voluntarily, knowingly, and intelligently waived his rights even though he was in the hospital being treated with narcotic painkillers, had recently attempted suicide, and had a history of mental illness since he was able to communicate effectively with the officers, provided responsive and comprehensible answers, and the record, including the transcript of the recorded interview, did not "suggest that defendant's mental or medical condition interfered with his ability to understand what [the] Detective [] was saying to him"); United States v. Harrison, CR No. 2:12CR193–MEF, 2013 WL 1918862, at *5-6 (M.D. Ala. Apr. 5, 2013), adopted by 2013 WL 1917814, at *1 (M.D. Ala. May 8, 2013) (finding defendant voluntarily waived his rights and agreed to speak with law enforcement when he provided coherent responses to the officers' questions, appeared "lucid and alert at all times," and did not request

medical attention or ask the officers to stop questioning, despite his contention that he was having a diabetic episode at the time of the interview).  Thus, the statements defendant made on August 19, 2015, are not due to be suppressed.

**B.    Motion to Suppress Evidence, [Doc. 13]**

Otoupal challenges the admissibility of evidence obtained from his cellular phone on grounds that he was entitled to Miranda warnings prior to questioning and that his impaired state invalidated his statements, including his statement providing the password to his cell phone, and rendered them involuntary. See [Doc. 13]; see also [Doc. 23].  In particular, Otoupal contends that "[a]lthough the agents had a search warrant for phones within the residence, in the absence of [] Otoupal providing his password, they would not have been able to search his phone," and that he "did not voluntarily provide the password to his phone[.]"  [Doc. 13 at 2].

In response, the government points out that Otoupal's "motion to suppress statements and the motion to suppress evidence involve the same nucleus of facts" and that the "issue is not the seizure of [Otoupal's] cell phone, which contained child pornography, because the phone was taken pursuant to a validly issued federal search warrant."  [Doc. 21 at 2].  Rather, Otoupal moves to suppress the evidence obtained from his cell phone on the basis that he involuntarily and without receiving Miranda warnings "provided the password to his cell phone to the agents

when they interviewed him." [Id.].  Having already concluded that Otoupal was not in custody at the time he made the statements on August 19, 2015, and that his statements during the interview, including providing the password to his cell phone, were voluntarily made, Otoupal's statements are admissible, and his motion to suppress evidence, [Doc. 13], is therefore due to be denied.

## III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Otoupal's motions to suppress statements and evidence, [Docs. 11 &13], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 18th day of November, 2014.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE